J-S32043-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF:  H.L., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF:  D.F.W., NATURAL MOTHER | No. 79 WDA 2014 |

Appeal from the Order entered December 5, 2013,
in the Court of Common Pleas of Blair County, Civil Division,
at No(s): CP-07-DP-0000100-2012

| | |
|---|---|
| IN THE INTEREST OF:  B.L., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF:  D.F.W., NATURAL MOTHER | No. 80 WDA 2014 |

Appeal from the Order entered December 5, 2013,
in the Court of Common Pleas of Blair County, Juvenile Division,
at No(s): CP-07-DP-0000102-2012

| | |
|---|---|
| IN RE:  B.S.L., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF:  D.F.W., NATURAL MOTHER | No. 81 WDA 2014 |

Appeal from the Decree entered December 10, 2013,
in the Court of Common Pleas of Blair County, Orphans'
Court, at No(s): 2013 AD 44

| | |
|---|---|
| IN THE INTEREST OF: H.R.-S.L., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: D.F.W., NATURAL MOTHER | No. 82 WDA 2014 |

Appeal from the Decree entered December 10, 2013,
in the Court of Common Pleas of Blair County, Orphans'
Court, at No(s): 2013 AD 44-A

BEFORE:    PANELLA, DONOHUE, and ALLEN, JJ.

MEMORANDUM BY ALLEN, J.:                    **FILED AUGUST 04, 2014**

Appellant, D.F.W. ("Mother"), appeals from the order and decrees entered on December 5, 2013 and December 10, 2013, terminating Mother's parental rights to H.L. (born in July of 2004) and B.L. (born in February of 2002) (collectively "the Children"), and changing their permanency goals to adoption.[1]  We affirm.

Since 2004, Blair County Children, Youth and Families ("CYF") has been involved with this family due to Mother's inability to care for and provide supervision for the Children, her abusive relationships with men, lack of suitable housing, Mother's drug use, Mother's mental health issues, and her failure to cooperate with CYF.[2]

On May 3, 2012, H.L. was removed from Mother's care and placed in Clarion Psychiatric Hospital for H.L.'s suicidal and homicidal intentions following a Childline report that Mother's paramour, D.R., abused H.L.  CYF was unable to establish that the allegations rose to the level of abuse.  On June 22, 2012, H.L. was released from Clarion Psychiatric Hospital, and placed in a mental health foster home through Blair County Mental Health Services.

---

[1] On December 10, 2013, R.L. ("Father") voluntarily relinquished his parental rights to the Children.

[2] On December 4, 2012, Mother's parental rights to K.W. and T.W., who are the Children's half-siblings, were terminated.

On July 7, 2012, CYF received a report that Mother was unable to appropriately provide for the Children; i.e., that they were without proper care and control. On August 13, 2013, CYF received a report that B.L. had been acting out at home, acting out sexually, and that Mother was diagnosed with Post Traumatic Stress Disorder, anxiety, and severe depression. On August 14, 2012, CYF received a Childline report that Mother took the Children to Altoona Regional Hospital because they were exhibiting sexual acts on each other, and that D.R. abused the Children. On August 14, 2012, Mother signed a Voluntary Placement Agreement to place B.L. in a foster home, and H.L. remained in his therapeutic foster home through Mental Health Services.

On August 27, 2012, Mother moved out of her home and was residing at an emergency shelter. On September 17, 2012, following a dependency hearing, the trial court adjudicated the Children dependent. The September 17, 2012 order directed Mother to: (1) refrain from all criminal activity; (2) attain and maintain clean, safe and appropriate housing; (3) notify CYF within 48 hours of all changes in household composition, housing, and employment; (4) cooperate with all caseworkers and service providers; (5) immediately provide caseworkers and all service providers with signed and current consents of release and exchange of information; (6) fully cooperate with all rules of the Children's placement; (7) undergo drug and alcohol evaluations and follow all treatment recommendations; (8) undergo

psychiatric evaluations and follow all treatment recommendations; and (9) attend Women Aware.

On November 8, 2012, H.L. was accepted by Sarah Reed Children's Center ("Sarah Reed"), but CYF was unable to reach Mother for her to sign the necessary paperwork for H.L. to be admitted to Sarah Reed. On November 14, 2012, the trial court granted CYF emergency protective custody of H.L. and admitted H.L. to Sarah Reed. On November 14, 2012, B.L. was placed in the custody of D.H. ("Foster Mother"). On June 24, 2013, H.L. left Sarah Reed and was placed in Hoffman Homes for Youth ("Hoffman Homes"), where he has remained.

On July 9, 2013, CYF filed a petition to involuntarily terminate Mother's parental rights to the Children and a motion for goal change to adoption. On July 23, 2013, October 28, 2013, and November 26, 2013, the trial court held hearings on the goal change and termination petition. At the hearing, Officer Cornell Thompson; Officer Nichole Douglas; Officer Derek Swope; Kristel Wisor, a worker at Family Intervention Crisis Services ("FICS"); Foster Mother; William Harper, H.L.'s therapist at Sarah Reed; Jennifer Vieth, H.L.'s therapist at Hoffman Homes; and Damien Charlesworth, a CYF caseworker; Father; and Mother testified. On December 5, 2013, the trial court entered its decrees terminating Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8) and (b), and orders changing their

- 4 -

permanency goal to adoption, and, on December 10, 2013, the trial court entered amended decrees terminating Mother's parental rights.

On January 3, 2014, Mother timely filed notices of appeal, along with concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). On January 30, 2014, the appeals were consolidated *sua sponte*.[3] Mother raises the following issues.

1. Whether or not the trial court erred in terminating Mother's parental rights?

2. Whether or not the trial court erred in changing the goal to adoption?

Mother's Brief at 30.

Our standard of review regarding orders terminating parental rights is as follows:

> When reviewing an appeal from a decree terminating parental rights, we are limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, this Court must accord the hearing judge's decision the same deference that we would give to a jury verdict. We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

*In re S.H.*, 879 A.2d 802, 805 (Pa. Super. 2005). In termination cases, the burden is upon the petitioner to prove by clear and convincing evidence that

_____

[3] On June 16, 2014, this Court directed the trial court to provide an analysis regarding Mother's appellate issues, including termination pursuant to 23 Pa.C.S.A. § 2511(a) and (b), and goal change to adoption pursuant to 42 Pa.C.S.A. § 6351.

the asserted grounds for seeking the termination of parental rights are valid.

*Id.* at 806. We have previously stated:

> The standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue."

*In re J.L.C. & J.R.C.*, 837 A.2d 1247, 1251 (Pa. Super. 2003).

The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence. *In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004). If competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result. *In re Adoption of T.B.B.,* 835 A.2d 387, 394 (Pa. Super. 2003). Additionally, this Court "need only agree with [the trial court's] decision as to any one subsection in order to affirm the termination of parental rights." *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*), *appeal denied*, 581 Pa. 668, 863 A.2d 1141 (2004). Accordingly, as the trial court focused on Section 2511(a)(1) in terminating Mother's parental rights, we will focus on that section for our review.

In terminating Mother's parental rights, the trial court relied upon Section 2511(a)(1) and (b) which provide:

> **§ 2511. Grounds for involuntary termination**
>
> **(a) General rule.**--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

* * *

**(b) Other considerations**.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511.

We have explained this Court's review of a challenge to the sufficiency of the evidence to support the involuntary termination of a parent's rights pursuant to section 2511(a)(1) as follows:

To satisfy the requirements of section 2511(a)(1), the moving party must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties. In addition,

Section 2511 does not require that the parent demonstrate both a settled purpose of relinquishing parental claim to a child and refusal or failure to perform parental duties. Accordingly, parental rights may be terminated pursuant to [s]ection 2511(a)(1) if the parent either demonstrates a settled purpose of relinquishing parental claim to a child or fails to perform parental duties.

- 7 -

> Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to [s]ection 2511(b).

*In re Z.S.W.*, 946 A.2d 726, 730 (Pa. Super. 2008) (internal citations omitted).

Regarding the definition of "parental duties," this Court has stated:

> There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this Court has held that the parental obligation is a positive duty which requires affirmative performance.
>
> This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child.
>
> Because a child needs more than a benefactor, parental duty requires that a parent exert himself to take and maintain a place of importance in the child's life.
>
> Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with . . . [the child's] physical and emotional needs.

- 8 -

*In re B., N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004), *appeal denied*, 582 Pa. 718, 872 A.2d 1200 (2005) (internal citations omitted).

On appeal, Mother argues that the trial court erred in terminating her parental rights to the Children. Mother's Brief at 4. Specifically, Mother contends that she has suitable housing, she does not have mental health issues, and she had reasonable excuses for missing visits with the Children. Mother's Brief at 33-42.

In terminating Mother's parental rights pursuant to section 2511(a)(1), the trial court reviewed the record and the evidence presented, and concluded that it is clear from the record that, for a period of six months leading up to the filing of the petition for involuntary termination, Mother failed to perform any parental duties for the Children. H.L. was removed from Mother's care since May 3, 2012, and B.L. was removed from Mother's care since August 14, 2012.

The trial court determined:

[E]ven though [M]other clearly loves her children, and [H.L.] consistently expresses a desire to live with her, and cares deeply about her, and benefits from having contact with her, [M]other has not demonstrated any ability to provide the [Children] a safe, secure and stable environment. She has not invested in any services for her own personal benefit. She has not cooperated with [CYF]. She has not provided any independent verification concerning their medical treatment, her prescriptions, etc. She has not been honest with service providers. [The trial court] found her testimony to be lacking in credibility (e.g. in trying to explain why there has been so many missed visits, missed phone calls, failure to attend the monthly team meetings). [The trial court found] [Mother] to be an

excuse maker, i.e., that it is everyone else's fault that the boys are in their current placements[--] it is the fault of [Father], [CYF], etc. We find that she does not recognize and appreciate the significance of the issues the boys are facing, especially [H.L.]. She essentially states that a return to her care will help "cure" all these issues, despite the fact that these issues existed when the children where in her care, custody and control, including prior psychiatric hospitalizations ….

Permanency Review Order, 12/5/13, at 5.

Ms. Wisor, a caseworker for FICS, testified that FICS Reunification Services were open on January 18, 2013 for reunification for Mother and B.L. N.T., 7/23/13, at 32-33. Ms. Wisor testified that Mother's visits with B.L. decreased and became fully supervised due to concerns with Mother missing meetings, B.L.'s behavior declining, and concerns that D.R. was residing with Mother. *Id.* at 35-41. Ms. Wisor testified that Mother never advanced past step one because she missed thirty-six percent of her visits with B.L. and thirty percent of her meetings. *Id.* at 52-53.

Ms. Wisor testified that during FICS services, Mother tested positive for opiates and benzodiazepines. *Id.* at 39. Ms. Wisor testified that Mother has health problems, but never provided FICS with confirmation as to the medication Mother was taking. *Id.* at 50. Ms. Wisor also found that Mother's housing was inappropriate, and Mother was not employed. *Id.* at 48. Mother received unemployment compensation, and it expired in February of 2013. *Id.* Further, Ms. Wisor testified that FICS made it clear to Mother that reunification with the Children was not possible if she remained in contact with D.R. *Id.* at 42-43. Ms. Wisor testified that D.R.

was found hiding in Mother's attic, and his mail continued to be delivered to Mother's residence. *Id.* at 36.

Officer Douglas testified that he had approximately twelve interactions with Mother over the past two years. *Id.* at 17-18. Officer Douglas expressed concerns for the Children's safety in the home. *Id.* at 19-20. Officer Swope testified that, on June 4, 2013, Mother and D.R. were involved in an altercation where Mother was struck several times by D.R. *Id.* at 29-30. Ms. Wisor testified that, on July of 2013, FICS services were closed because of Mother's lack of progress. *Id.* at 46-47.

Mr. Harper, H.L.'s therapist from Sarah Reed, testified that he worked on issues of safety, anger management, and reducing anxiety with H.L. *Id.* at 82. Mr. Harper testified that he was unable to make significant progress with family therapy because of the lack of consistent contacts with Mother and the existence of domestic violence in Mother's house. *Id.* at 90, 92. Moreover, Ms. Veith, a therapist at Hoffman Homes, testified that H.L. was only able to contact Mother fifty percent of time, and Mother failed to participate in monthly meetings to discuss H.L.'s progress and goals. *Id.* at 112. Ms. Veith also testified that H.L.'s aggressive behavior and anxiety is triggered when he cannot get in touch with Mother. 7/23/13, 104-105; 10/28/13, at 31. Ms. Veith stated that H.L.'s anxiety is a result of witnessing and experiencing domestic violence in Mother's residence. N.T., 10/28/13, at at 29.

Mr. Charlesworth testified that FICS closed its services at the end of July 2013 because of lack of progress. He testified that CYF was willing to arrange bi-weekly visits and provide transportation, but Mother did not attend any of the visits in August or September of 2013. N.T., 11/16/13, at 3-6.

The testimony established that reunification between the Children and Mother had been unsuccessful due to Mother's lack of stable housing and environment, and her failure to cooperate with CYF. In the instant matter, the trial court found that Mother failed to fulfill her parental duties and responsibilities for two years. Supplemental Trial Court Opinion, 6/24/14, at 10. The testimony established that the Children are in stable foster placement, and that adoption is in the best interest of the Children. Therefore, we are constrained to conclude that the trial court properly terminated Mother's parental rights pursuant to section 2511(a)(1). We will not disturb the trial court's determinations. *In re M.G.*, 855 A.2d 68, 73-74.

The trial court must also consider how terminating Mother's parental rights would affect the needs and welfare of Children pursuant to 23 Pa.C.S.A. § 2511(b). Pursuant to section 2511(b), the trial court's inquiry is specifically directed to a consideration of whether termination of parental rights would best serve the developmental, physical and emotional needs of the child. *See In Re C.M.S.*, 884 A.2d 1284, 1286-87 (Pa. Super. 2005),

*appeal denied*, 587 Pa. 705, 897 A.2d 1183 (2006). "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." *Id.* at 1287 (citation omitted). We have instructed that the court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. *See id*.

Here, the trial court concluded that termination of Mother's parental rights to the Children would serve their developmental, physical, and emotional needs and welfare. Supplemental Trial Court Opinion, 6/25/14, at 11. The trial court found that Mother and the Children have an unhealthy bond. Permanency Review Order, 12/5/13, at 4. With respect to B.L., the trial court explained:

> [T]here was sufficient evidence to show that there is no significant bond with his mother. After B.L.'s placement, [Mother] was sporadic in visits and did not participate in her child's services. B.L. actually looked to [F]oster [M]other as B.L.'s mom and the foster home as being his "home." B.L. showed little interest in his mother when she was absent or not engaged with services or visits. As we specifically found, if a bond existed, it was an "unhealthy" bond. Once the goal was changed and an adoptive home identified, B.L. was able to attach to the family and is more than ready to make a permanent transition to the adoptive home.

Supplemental Trial Court Opinion, 6/25/14, at 10.

With respect to H.L., the trial court observed:

> [H.L.] clearly had difficulty being apart from [M]other, the evidence also supported, and we found, that his bond with [M]other was "unhealthy" as well. Any anxiety and stress that H.L. felt from being apart from his mother was related to his

- 13 -

concern as to whether she was okay due to his witnessing the domestic violence over the years. Even though some concern was expressed as to how H.L. would react if [M]other's parental rights were terminated, the evidence subsequently established that he was able to move on and start bonding with other pre-adoptive parents, as his counselors, Mr. Harper and Jessica Veith, predicted and confirmed.

*Id.* at 10-11.

While Mother professes that she loves the Children, this Court has held that a parent's love of her child, alone, does not preclude a termination. *See In re L.M.*, 923 A.2d 505, 512 (Pa. Super. 2007). Likewise, we have stated that the mere existence of a bond or attachment of a child to a parent will not necessarily result in the denial of a termination petition. *See In re K.K.R.-S.*, 958 A.2d 529, 535 (Pa. Super. 2008).

After this Court's careful review of the record, we find that the competent evidence supports the trial court's determination that there was no bond between Mother and the Children which, if severed, would be detrimental to the Children, and that the termination of Mother's parental rights would best serve the needs and welfare of the Children. Thus, we will not disturb the trial court's determinations. *See In re M.G.*, 855 A.2d at 73-74. We affirm the decrees terminating Mother's parental rights on the basis of section 2511(a)(1) and (b).

Next, we address Mother's challenge to the change of the permanency goal for Children to adoption. This Court has stated:

When reviewing an order regarding the change of a placement goal of a dependent child pursuant to the Juvenile Act, 42 Pa. C.S.A. § 6301, *et seq.*, our standard of review is abuse of discretion. When reviewing such a decision, we are bound by the facts as found by the trial court unless they are not supported in the record.

***In re B.S.***, 861 A.2d 974, 976 (Pa. Super. 2004) (citation omitted).

In order to conclude that the trial court abused its discretion, we must determine that the court's judgment was manifestly unreasonable, that the court did not apply the law, or that the court's action was a result of partiality, prejudice, bias or ill will, as shown by the record. We are bound by the trial court's findings of fact that have support in the record. The trial court, not the appellate court, is charged with the responsibilities of evaluating credibility of the witnesses and resolving any conflicts in the testimony. In carrying out these responsibilities, the trial court is free to believe all, part, or none of the evidence. When the trial court's findings are supported by competent evidence of record, we will affirm even if the record could also support an opposite result.

***In re A.K.***, 936 A.2d 528, 533 (Pa. Super. 2007).

Section 6351(f) of the Juvenile Act sets forth the following pertinent inquiries for the reviewing court:

**(f) Matters to be determined at permanency hearing.—**

At each permanency hearing, a court shall determine all of the following:

(1) The continuing necessity for and appropriateness of the placement.

(2) The appropriateness, feasibility and extent of compliance with the permanency plan developed for the child.

(3) The extent of progress made toward alleviating the circumstances which necessitated the original placement.

- 15 -

(4) The appropriateness and feasibility of the current placement goal for the child.

(5) The likely date by which the placement goal for the child might be achieved.

(5.1) Whether reasonable efforts were made to finalize the permanency plan in effect.

(6) Whether the child is safe.

. . .

(9) If the child has been in placement for at least 15 of the last 22 months or the court has determined that aggravated circumstances exist and that reasonable efforts to prevent or eliminate the need to remove the child from the child's parent, guardian or custodian or to preserve and reunify the family need not be made or continue to be made, whether the county agency has filed or sought to join a petition to terminate parental rights and to identify, recruit, process and approve a qualified family to adopt the child unless:

   (i) the child is being cared for by a relative best suited to the physical, mental and moral welfare of the child;

   (ii) the county agency has documented a compelling reason for determining that filing a petition to terminate parental rights would not serve the needs and welfare of the child; or

   (iii) the child's family has not been provided with necessary services to achieve the safe return to the child's parent, guardian or custodian within the time frames set forth in the permanency plan.

42 Pa.C.S.A. § 6351(f)(1)-(6), (9).

In addition:

The trial court must focus on the child and determine the goal with reference to the child's best interests, not those of the parents. "Safety, permanency, and well-being of the child must

- 16 -

take precedence over **all** other considerations." Further, at the review hearing for a dependent child who has been removed from the parental home, the court must consider the statutorily mandated factors. "These statutory mandates clearly place the trial court's focus on the best interests of the child."

*In re S.B.*, 943 A.2d 973, 978 (Pa. Super. 2008) (emphasis in original) (citations and quotations omitted).

The record in this case reflects that the trial court appropriately considered the Children's best interests in deciding whether to change their permanency goal to adoption. The competent and in fact overwhelming evidence supports the trial court's determinations, as Mother will cannot provide proper parental care and control for the Children. Thus, we will not disturb the trial court's determinations. *See In re M.G.*, 855 A.2d at 73-74.

After careful review, we affirm the decrees and orders terminating Mother's parental rights on the basis of section 2511(a)(1) and (b), and changing the permanency goals for the Children to adoption.

Decrees and orders affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/4/2014

- 17 -